1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

EASTERN DISTRICT OF CALIFORNIA

10

ERNESTO TREVINO,

11
                                                    Case No. 1:19–cv–00870–SKO
             Plaintiff,

12
      v.
                                                    ORDER ON PLAINTIFF'S SOCIAL
13                                                  SECURITY COMPLAINT
ANDREW SAUL,
14   Commissioner of Social Security,

15           Defendant.                             (Doc. 1)

16
_____/
17

18                    **I.      INTRODUCTION**

19        On June 24, 2019, Plaintiff Ernesto Trevino ("Plaintiff") filed a complaint under 42 U.S.C.

20   § 1383(c) seeking judicial review of a final decision of the Commissioner of Social Security (the

21   "Commissioner" or "Defendant") denying his application for Supplemental Security Income (SSI)

22   under the Social Security Act (the "Act").  (Doc. 1.)  The matter is currently before the Court on

23   the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K.

24   Oberto, United States Magistrate Judge.[1]

25                    **II.     BACKGROUND**

26        Plaintiff was born on December 28, 1967, passed a GED test, and has no past relevant work.

27   (Administrative Record ("AR") 26, 83, 51, 52, 201, 206, 238, 273.)  He has been in and out of

28   _____
     [1] The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 6, 8.)

prison since he was 15 years old.  (AR 76–77, 95, 202.)

Plaintiff filed a claim for SSI payments on February 28, 2015, alleging he became disabled on February 1, 2014, due to post-traumatic stress disorder (PTSD), depression, high blood pressure, and "knee lock."  (AR 17, 22, 72, 84, 201, 205, 238, 241, 273, 368, 375.)

A.    **Relevant Medical Evidence[2]**

1.    **Merced County Department of Mental Health**

Plaintiff presented for mental health services on January 7, 2015, having been referred by his primary care provider after experiencing symptoms of depression, paranoia, and frustration. (AR 343.)  He reported serving 17 years in prison and having "witnessed many murders" there. (AR 343.)  According to Plaintiff, he hears voices and "sees shadows" in the night time.  (AR 343.) He is the oldest of seven children and stated that he has a "good relationship" with his siblings. (AR 344.)  Plaintiff reported having a strained relationship with his 24-year-old daughter, but a "good relationship" with his two 29-year-old sons.  (AR 656.)

Upon mental status examination, Plaintiff was cooperative with good eye contact and was oriented to time, place, person, and situation.  (AR 349, 661.)  His motor activity, cognitive performance and abstraction were all normal, with good insight but impaired judgment.  (AR 349, 661.) Plaintiff was assessed with auditory and visual hallucinations, but with clear speech, full affect, and "unremarkable" mood.  (AR 349–50, 661–62.)  He was diagnosed with PTSD.  (AR 314, 653, 668.)

On April 30, 2015, Plaintiff presented to Edward Benton, M.D. requesting medications for depression, auditory hallucinations, and symptoms of PTSD.  Plaintiff's physical examination showed "[n]o overt psychopathology."  (AR 356.)  Plaintiff was pleasant, cooperative, neat, and well-groomed, with good hygiene.  (AR 356.)  His intellect was within normal limits and his insight and judgment "acceptable."  (AR 356.)  Plaintiff's affect was full range.  (AR 356.)  Dr. Benton noted no overt psychosis, but Plaintiff complained of frequent and mostly unintelligible auditory hallucination of male voices that are "internal and ego dystonic."  (AR 356.)  Plaintiff reported that

---

[2] Because the parties are familiar with the medical evidence, it is summarized here only to the extent relevant to the contested issues.

his sleep was "plagued by nightmares," yet appeared well rested and nourished, with normal motor function.  (AR 356.)  Dr. Benton assessed Plaintiff with "psychosis [not otherwise specified]," cannabis use, "[rule out] ptsd due to prison experiences," and "[rule out] antisocial [personality disorder]" (AR 356.)  He was prescribed a trial of medications targeting his hallucinations and his mood.  (AR 356.)

Plaintiff presented for a medication review appointment with Dr. Benton on May 29, 2015. (AR 358.)   He reported experiencing depression and auditory hallucinations despite taking medication.  (AR 358.) Plaintiff's mental status examination showed that he was alert and oriented, neat and calm, and in no overt distress.  (AR 358.)  No overt psychosis was noted, and Plaintiff appeared well-rested and nourished.  (AR 358.) Dr. Benton recommended Plaintiff to continue his medications and to "taper[] up on med[ications]s to improve efficacy."  (AR 358.)

On July 23, 2015, Plaintiff complained to Dr. Benton that the increased dosage of Abilify made his auditory hallucinations worse.  (AR 360.)  He was observed to have a frustrated affect but no overt psychosis.  (AR 360.)  Dr. Benton recommended Plaintiff to stop taking Abilify and Zoloft and start a trial of Seroquel and Cymbalta.  (AR 360.)

Plaintiff presented for another medication review appointment with Dr. Benton on September 22, 2015.  (AR 361.)  He reported stopping taking his medication because they made him feel worse, not better.  (AR 361.)  Dr. Benton noted Plaintiff was irritable, with no overt psychosis, and good hygiene and grooming.  (AR 361.)  He recommended Plaintiff begin a dose of Risperdal.  (AR 361.)

On October 21, 2015, Plaintiff complained to Dr. Benton that he felt worse with Risperdal, so he stopped taking it.  (AR 363.)  He reported having moved into an apartment and "feeling [somewhat] better overall."  (AR 363.)  Upon examination, Plaintiff was irritable but much less than the previous visit.  (AR 363.) Dr. Benton found no overt psychosis.  (AR 363.)  Plaintiff was started on a trial of Zyprexa.  (AR 363.)

Plaintiff presented for another medication review appointment with Dr. Benton on November 19, 2015.  (AR 365.)  He reported no benefit from Zyprexa and that it caused him to itch.  (AR 365.)  Plaintiff's mental status examination showed he was alert, oriented, and calm,

1   with level affect and no overt psychosis.  (AR 365.)  Dr. Benton noted Plaintiff appeared well rested

2   and nourished.  (AR 365.)  He was recommended to start a trial of Geodon.  (AR 365.)

3        On December 14, 2015, Plaintiff reported poor compliance with medication, having

4   experienced feeling suicidal after taking it for two weeks.  (AR 366.)  He thereafter stopped taking

5   it.  (AR 366.)  Plaintiff also reported hearing voices and seeing shadows.  (AR 366.)  Upon mental

6   status examination, no psychosis was noted or reported, with Plaintiff appearing clean and neatly

7   groomed with good hygiene.  (AR 366.)  He had good eye contact, with regular speech, a calm and

8   cooperative demeanor, and appropriate affect.  (AR 366.)  Plaintiff denied any depressive feelings.

9   (AR 366.)  With respect to medication, Plaintiff stated that he did not want to try anything else.

10  (AR 366.)

11       **2.      Conrad Castellino, M.D.**

12       On March 2, 2015, Plaintiff presented to Dr. Castellino for a new patient consultation.  (AR

13  386.)  He complained of depression as a result of his incarceration, occasional bizarre thoughts,

14  and poor sleep.  (AR 386.)  Dr. Castellino observed Plaintiff had a "slightly anxious sad affect,"

15  and diagnosed him with depression and "mixed disor[der] reaction to stress."  (AR 388.)  He

16  advised Plaintiff to see a psychiatrist.  (AR 388.)

17       Plaintiff presented to Dr. Castellino for a routine check-up on May 4, 2015.  (AR 384.)  He

18  complained of hearing voices, depressed affect, and PTSD.  (AR 384.)  Plaintiff stated he had been

19  taking Abilify and Zoloft for a few days and felt they were not helping.  (AR 384.)  Upon

20  examination, Dr. Castellino noted Plaintiff's pleasant affect and that he was "not worried or

21  depressed," but indicated "some" anxiety.  (AR 384.)  He diagnosed Plaintiff with depression,

22  history of schizophrenia, and psychological stress.  (AR 384.)

23       **3.      Steven Swanson, Ph.D.**

24       Dr. Swanson conducted a psychological assessment of Plaintiff on September 23, 2015.

25  (AR 332–37.)  Plaintiff reported he was "slow learner" in school and received some special

26  education services, having stopped school altogether after sixth grade.  (AR 333.)  Most of his life

27  was spent "in-and-out of prison," where he got his GED.  (AR 333.)  Dr. Swanson noted Plaintiff's

28  appearance reflected excellent concern for his personal hygiene and grooming.  (AR 334.)  He was

adequately oriented to person, time, place, and situation. (AR 334.) Dr. Swanson noted Plaintiff's attitude during the assessment was friendly and cooperative, and he "appeared motivated to make a case for disability." (AR 334.) His level of eye contact was within normal limits. (AR 334.)

Dr. Swanson noted Plaintiff's speech was unremarkable with no observed peculiarities. (AR 334.) He exhibited a full range of affect that varied consonantly with speech content. (AR 334.) Plaintiff's mood was euthymic. (AR 334.) He reported having a "hard time getting used to be on the outs" the day of the testing and indicated that most days he feels like he is "trying to better myself . . . nobody wants to give me the chance." (AR 334.) Dr. Swanson noted Plaintiff's form and content of thought were within normal limits, with no evidence of delusional material or disorder of perception. (AR 334.) There was no indication of psychosis. (AR 334.)

Plaintiff elicited no suicidal or homicidal ideation, and "vegetative signs of depression" were "mostly" absent. (AR 334.) Dr. Swanson found Plaintiff's short-term, recent, and remote memories were within normal limits. (AR 334.) Plaintiff had adequate abstraction ability and adequate concentration for performing simple mathematical calculations. (AR 334.) Plaintiff's judgment and insight were deemed intact and his general fund of knowledge fell within normal limits. (AR 334.) Dr. Swanson found Plaintiff maintained satisfactory attention and concentration and the results of the assessment were considered a "valid representation of current functioning." (AR 334.)

Dr. Swanson administered the Wechsler Adult Intelligence Scale-4th Ed. ("WAIS-IV"), which he describes as "perhaps the most widely-used measure of an adult's intellectual functioning." (AR 335.) Plaintiff obtained a "Full Scale I.Q." of 75 on the WAIS-IV, which is the "Borderline Intellectual Functioning" range of intellectual ability. (AR 335.) Dr. Swanson noted that "[o]verall, these WAIS-IV results indicate that he can be expected to perform academically at a level that is considerably lower than same-aged peers," yet noted that Plaintiff's "effort was not optimal, so these results are seen as a low measure of true functioning." (AR 336.)

Dr. Swanson also administered the Wechsler Memory Scale ("WMS-IV") to assess "major dimensions of memory" in Plaintiff. (AR 336.) Plaintiff obtained an "Immediate Memory Index" (IMI) score of 69, which falls at the 2nd percentile and a "Delayed Memory Index" (DMI) score of

76, which falls at the 5th percentile.  (AR 336.)  Dr. Swanson observed that "[t]hese results are generally consistent with the findings from the intelligence test and do not reveal relative weakness in memory functioning," and noted that Plaintiff's "[e]ffort was not optimal so these results may be a low measure of true functioning."  (AR 336.)

Dr. Swanson diagnosed Plaintiff with "Antisocial Personality Disorder" (Axis II, 301.7) and "Borderline Intellectual Functioning" (Axis II, V62.89).  (AR 336.)  He found no indication of psychological disturbance.  (AR 337.)  Dr. Swanson opined that Plaintiff is

> able to maintain concentration and relate appropriately to others in a job setting. He would be able to handle funds in his own best interests.  He is expected to understand carry out and remember simple instructions.  He is judged able to respond appropriately to usual work situations such as attendance, safety, and the like.  Changes in routine would not be very problematic for him.  There do not appear to be substantial restrictions in daily activities.  Difficulties in maintaining social relationships do not appear to be present.

(AR 337.)

### 4.    Lance Portnoff, Ph.D., ABN

On March 22, 2016, Dr. Portnoff, a specialist in neuropsychology, performed a comprehensive psychiatric examination of Plaintiff.  (AR 395–403.)  Plaintiff's complaints were noted to be PTSD, hypertension, depression, and knee pain.  (AR 395.)  Plaintiff reported some social anxiety and hypervigilance but denied panic attacks or overreactive anger.  (AR 395.)  Plaintiff also reported having chronic insomnia, incomplete auditory (name, noises) and visual (side shadows) hallucinations consistent with chronic sleep deprivation.  (AR 395.)  He further reported chronic, low level depression without vegetative symptoms or suicidal ideas.  (AR 396.)

Dr. Portnoff found Plaintiff demonstrated adequate concentration, persistence, and pace. (AR 396.)  Plaintiff's speech was spontaneous and prompt, and his thought process was coherent, but mildly concrete.  (AR 397.)  Dr. Portnoff found Plaintiff's thought content appropriate to the situation.  (AR 397.)  He denied any hallucinations and active suicidal ideation.  (AR 397.)  Plaintiff's affect as expressed in speech and demeanor was characterized by mild tension.  (AR 397.)

Dr. Portnoff noted Plaintiff was oriented to time and place and was in touch with his

immediate surroundings.  (AR 397.)  His immediate recall of three words was intact, he had a delayed recall of two out of three words, and he was able to remember autobiographical information.  (AR 397.)  Plaintiff's social judgment was inadequate, and he had "some" insight into his psychological symptoms.  (AR 398.)

Dr. Portnoff administered the WAIS-IV and WMS-IV tests and noted that Plaintiff "seem[ed] to be making an adequate effort, so that these findings are considered to be a valid representation of his current cognitive status."  (AR 398.)  Plaintiff's "Full Scale" WAIS-IV score was 64, which indicated a mild impairment.  (AR 398.)  His WMS-IV score showed mild impairments in all areas except immediate memory, which was moderately impaired.  (AR 401.)

Dr. Portnoff diagnosed Plaintiff with "Unspecified Anxiety Disorder with Depressive Features," "Unspecified Learning Disorder," and "R/O Attention Deficit-Hyperactivity Disorder Inattentive."  (AR 402.)  He indicated that "[c]urrent cognitive testing is indicative of generalized deficiency in verbal and visual reasoning, working memory, processing speed, and in immediate/delayed verbal/visual memory."  (AR 402.)

Dr. Portnoff opined Plaintiff can manage his own funds independently, is able to perform simple and repetitive tasks, and has mild to moderate limitations in his ability to perform detailed and complex tasks.  (AR 402.)  He found that Plaintiff has mild limitations in his ability to accept instructions from supervisors and has mild limitations in his ability to interact with coworkers and the public due to deficits in language, reasoning, memory, and attention and due to his anxiety disorder.  (AR 402.)  Plaintiff also had mild limitations in his ability to work on a consistent basis without special or additional instruction.  (AR 402.)  According to Dr. Portnoff, Plaintiff had no limitations in his ability to maintain regular attendance in the workplace from a psychological standpoint but has mild to moderate limitations in his ability to complete a normal workday or workweek without interruptions from a psychiatric condition due to combined cognitive symptoms.  (AR 403.)  Plaintiff's ability to deal with the stress encountered in a competitive work environment was mildly impaired.  (AR 403.)

**5.    "Horisons" Unlimited Clinics**

On September 23, 2016, Plaintiff presented for a telehealth visit for mental health services.

1   (AR 486.)  He reported taking Norco for back pain but no psychotropic medications.  (AR 486.)

2   Plaintiff reported having a history of auditory and visual hallucinations, which did "no[t] limit his

3   daily functioning."  (AR 486.)  He also reported intermittent anxiety and depression but the

4   "[symptoms] are manageable."  (AR 486.)  His mental status examination showed he was well-

5   dressed with good hygiene and was cooperative, maintained eye contact, and had effective

6   communication  (AR 486.)  He was oriented on all spheres and speech was clear.  (AR 486.)

7   Plaintiff's mood was euthymic with affect that was congruent to mood.  (AR 486.)  He reported

8   that he has restless sleep, but no problems with appetite.  Plaintiff's thought process was linear and

9   future oriented, with no bizarre delusions or paranoia.  (AR 486.)  His insight and judgment were

10  within normal limits.  (AR 486.)  He was diagnosed with moderate recurrent major depression and

11  recommended to undergo cognitive behavioral therapy.  (AR 487.)

12      Plaintiff presented for an individual therapy appointment on November 4, 2016.  (AR 469.)

13  He complained of outbursts of anger directed at his girlfriend that resulted in him becoming

14  verbally abusive.  (AR 469.)  Plaintiff also acknowledged an addiction to marijuana, which he

15  reported increases his anxiety and mood swings.  (AR 469.)  Upon mental status examination,

16  Plaintiff had a pleasant mood, flat affect, decreased concentration, clear speech, and connected

17  thought.  (AR 469.)  His behavior was described as isolative, withdrawn, and restless.  (AR 469.)

18  His immediate, short and long-term memory were all intact.  (AR 469.)  Plaintiff was encouraged

19  to keep a mood/pain log.  (AR 470.)

20      On December 9, 2016, Plaintiff had another individual therapy appointment.  (AR 458.)

21  His chief complaints were anger and anxiety and he reported self-medicating with marijuana  (AR

22  458.)  Plaintiff's mental status examination showed pleasant but depressed mood.  (AR 458.)  His

23  concentration was decreased, and his speech pressured.  (AR 458.)  His thoughts were connected.

24  (AR 458.)   Plaintiff's behavior was described as easily distracted, isolative, withdrawn, and

25  restless.  (AR 458.)  His immediate, short and long-term memory were all intact.  (AR 458.)

26  Plaintiff was advised to practice communication skills with his girlfriend.  (AR 459.)

27      At his individual therapy session on February 2, 2017, Plaintiff complained that he was

28  arguing with his girlfriend but stated he no longer drinks alcohol "because of the consequences of

such." (AR 442.) He reported daily cannabis use. (AR 442.) Upon mental status examination, Plaintiff's mood was pleasant, depressed, and anxious. (AR 442.) His concentration was decreased, his speech was clear and connected, and his thoughts connected and relevant. (AR 442.) Plaintiff's behavior was described as isolative, withdrawn, and restless. (AR 442.) His immediate, short and long-term memory were all intact. (AR 442.)

At his March 2, 2017 individual therapy session, Plaintiff reported experiencing anxiety as a result of arguing with his girlfriend. (AR 434.) He stated that his temper is "better controlled" and his mood was "more even." (AR 434.) Plaintiff's mental status examination showed his mood was pleasant but anxious, with good concentration. (AR 434.) His speech was clear, and his thoughts connected. (AR 434.) Plaintiff's behavior was withdrawn and restless, but his immediate, short and long-term memory were all intact. (AR 434.)

**B.    Plaintiff's Statements**

Plaintiff completed adult function reports on May 11, 2015 (AR 212–20) and February 25, 2016 (AR 248–57). Plaintiff reported that he gets paranoid around people, cannot be around large crowds, gets nervous around law enforcement, hears voices, and experiences nightmares. (AR 212, 248.) Plaintiff also reported suffering from depression and PTSD from the violence he has seen in prison. (AR 248.)

According to Plaintiff, he has no problems with personal care and preparing light meals but needs reminders to keep appointments. (AR 213, 214, 250.) He can perform house work and do some shopping in stores. (AR 215, 250. *See also* AR 405.) He drives to doctors' appointments every month without accompaniment. (AR 216, 252.) Plaintiff reported enjoying drawing, painting, and watching television. (AR 216, 252.) He stated he does not spend time with others and cannot be with groups of people (AR 217, 253), but reported he talks on the phone with others twice a week. (AR 252.) Plaintiff reported having trouble with memory, concentration, completing tasks, following instructions, and getting along with others due to his paranoia. (AR 217, 254.) According to Plaintiff, sometimes he "feel[s] really scared for no reason." (AR 219.) He reported taking Abilify, sertraline, Seroquel, and duloxetine, but indicated he experiences side effects of suicidal thoughts, nausea, vomiting, stomach pain, weakness, dizziness, headaches, and

1  sleeplessness.  (AR 219, 256.)

2      On April 27, 2016, Plaintiff reported to the consultative orthopedist that he can do whatever

3  cooking is required, as well as household chores of vacuuming, mopping, taking the trash out,

4  laundry, and dishes as needed.  (AR 405.)  Plaintiff further stated that he watches television and

5  performs "computer work" for about four hours per day.  (AR 405.)

6  **C.      Administrative Proceedings**

7      The Commissioner denied Plaintiff's application for benefits initially on October 2, 2015,

8  and again on reconsideration on May 18, 2016.  (AR 99–103; AR 106–110.)  Consequently,

9  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 113–128.)  The

10  ALJ conducted a hearing on March 2, 2018.  (AR 46–70.)  Plaintiff appeared at the hearing with

11  counsel and testified.  (AR 51–67.)  A vocational expert also testified.  (AR 67–70.)

12      **1.      Plaintiff's Testimony**

13      Plaintiff testified that, having been in prison, he is "used to being in a cell" and doesn't feel

14  comfortable "being out all the time."  (AR 54.)  He sticks to a routine and gets agitated when it is

15  interrupted.  (AR 54.)  Plaintiff lives alone and testified he can clean his house.  (AR 64.)  He

16  designs and performs tattoos for relatives and other people he knows as a hobby.  (AR 55–56.)

17      Plaintiff stated he hears voices and sees shadows at least twice a week.  (AR 55, 61, 62.)  He

18  does not like being in crowded places and usually asks his cousin to shop for groceries.  (AR 58.)

19  Plaintiff is currently seeing a therapist and reported occasionally using marijuana, which does not

20  affect his symptoms.  (AR 60, 66.)  He testified that the therapy is helping, but that he stopped

21  taking medications because they made him feel suicidal.  (AR 61, 62.)  He does not sleep very well,

22  gets only a couple hours of sleep per night, and experiences nightmares.  (AR 62, 63.)  As a result

23  of his lack of sleep, Plaintiff testified he has mood swings.  (AR 64.)

24      **2.      Vocational Expert's Testimony**

25      The ALJ asked the Vocational Expert ("VE") to consider a person of Plaintiff's age and

26  education, and work history.  (AR 68.)  The VE was also to assume this person would be able to

27  work at the medium exertional level with frequent climbing of ramps and stairs but no climbing

28  ladders, ropes, or scaffolding.  The person could perform occasional balancing, stooping, kneeling,

crouching, and crawling, but must avoid exposure to the extreme cold.  (AR 68.)  The VE testified

that such a person could perform work as a hand packer, Dictionary of Operational Titles ("DOT")

code 920.587-018, medium exertion level, with a specific vocational preparation (SVP)[3] of 2, for

which there are 399,000 jobs in the national economy.  (AR 68.)  The ALJ also testified that such

a person could perform work as a cleaner, DOT code 919.687-014, medium exertion level, and

SVP 1, for which there are 195,000 jobs, and could also perform work as a packing machine

operator, DOT code 920.685-078, medium exertion level and SVP 2, for which there are 62,000

jobs in the nation.  (AR 68.)

In a second hypothetical, the VE was asked by the ALJ to consider this same person as in

the first hypothetical, but include the additional limitations that the person would be limited to

performing simple, routine tasks, with occasional public contact of a superficial nature.  (AR 68.)

The VE testified that the same jobs as identified before would be available.  (AR 68.)  The ALJ's

third hypothetical concerned the same person in the second hypothetical, with the additional

limitation that the person would need frequent supervision throughout the day to remain on task

due to mental health symptoms.  (AR 68.)  The VE testified that no jobs were available for that

person.  (AR 68.)

Plaintiff's counsel asked the VE to consider the person presented in the second hypothetical,

but who would miss three days in a typical month.  (AR 68–69.)  The VE responded that there is

no work such a person could perform.  (AR 69.)  Plaintiff's counsel further inquired of the VE

whether there would be any available work if the same individual in the second hypothetical were

off task 15% of the workday; the VE responded there would be no available work.  (AR 69.)

**D.    The ALJ's Decision**

In a decision dated May 9, 2018, the ALJ found that Plaintiff was not disabled, as defined

by the Act.  (AR 17–28.)  The ALJ conducted the five-step disability analysis set forth in 20 C.F.R.

§ 416.920.  (AR 19–28.)  The ALJ decided that Plaintiff had not engaged in substantial gainful

---

[3] Specific vocational preparation, as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.  DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991).  Jobs in the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the highest level – over 10 years of preparation).  *Id*.

activity since February 28, 2015, the application date (step one).  (AR 19.)  At step two, the ALJ

found Plaintiff's following impairments to be severe: degenerative disc disease of the lumbar spine,

mild degenerative changes of the cervical spine, patellofemoral chondromalacia of the knees, post-

traumatic stress disorder (PTSD), and major depressive disorder.  (AR 19.)  Plaintiff did not have

an impairment or combination of impairments that met or medically equaled one of the listed

impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") (step three).  (AR 19–

21.)

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[4] and applied the

assessment at steps four and five.  *See* 20 C.F.R. § 416.920(a)(4) ("Before we go from step three

to step four, we assess your residual functional capacity . . . . We use this residual functional

capacity assessment at both step four and step five when we evaluate your claim at these steps.").

The ALJ determined that Plaintiff retained the RFC:

> to perform medium work as defined in 20 CFR [§] 416.967(c) except that
> [Plaintiff] can lift and/or carry up to fifty pounds occasionally and twenty-
> five pounds frequently; [Plaintiff] can stand, walk, or sit up to six hours of
> an eight hour workday; [Plaintiff] can frequently climb ramps or stairs but
> can never climb ladders, ropes, or scaffolds; [Plaintiff] can occasionally
> balance, stoop, kneel, crawl, and crouch; [Plaintiff] should avoid all
> exposure to extreme cold; and [Plaintiff] is limited to simple routine tasks.

(AR 21.)  Although the ALJ recognized that Plaintiff's impairments "could reasonably be expected

to cause the alleged symptoms[,]" she rejected Plaintiff's subjective testimony as "not entirely

consistent with the medical evidence and other evidence in the record."  (AR 22.)  The ALJ

determined that Plaintiff had no past relevant work (step 4), but that he was not disabled because,

given his RFC, he could perform a significant number of other jobs in the local and national

economies, specifically hand packager, machine packager, and cleaner (step 5).  (AR 26–27.)

Plaintiff sought review of this decision before the Appeals Council, which denied review

---

[4] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule.  TITLES II & XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, Social Security Ruling ("SSR") 96-8P (S.S.A. July 2, 1996).  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  *Id.*  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'"  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

on February 13, 2019.  (AR 14–19.)  Therefore, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. § 416.1481.

### III.      LEGAL STANDARD

#### A.      Applicable Law

An individual is considered "disabled" for purposes of disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  However, "[a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id.* § 423(d)(2)(A).

"In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility [for disability benefits], the Commissioner" is required to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity."  *Id.* § 423(d)(2)(B).  For purposes of this determination, "a 'physical or mental impairment' is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  *Id.* § 423(d)(3).

"The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act."  *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520); *see also* 20 C.F.R. § 416.920.  The Ninth Circuit has provided the following description of the sequential evaluation analysis:

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity.  If so, the claimant is not disabled.  If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments.  If not, the claimant is not disabled.  If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, [a]pp. 1.  If so, the claimant is automatically presumed disabled.  If

not, the ALJ proceeds to step four and assesses whether the claimant is capable of performing [his] past relevant work.  If so, the claimant is not disabled.  If not, the ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . to perform any other substantial gainful activity in the national economy.  If so, the claimant is not disabled.  If not, the claimant is disabled.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see, e.g.*, 20 C.F.R. § 416.920(a)(4) (providing the "five-step sequential evaluation process" for SSI claimants).  "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520); 20 C.F.R. § 416.920.

"The claimant carries the initial burden of proving a disability in steps one through four of the analysis." *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989)).  "However, if a claimant establishes an inability to continue [his] past work, the burden shifts to the Commissioner in step five to show that the claimant can perform other substantial gainful work." *Id.* (citing *Swenson*, 876 F.2d at 687).

**B.    Scope of Review**

"This court may set aside the Commissioner's denial of [social security] benefits [only] when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole."  *Tackett*, 180 F.3d at 1097 (citation omitted).  "Substantial evidence is defined as being more than a mere scintilla, but less than a preponderance." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citing *Tackett*, 180 F.3d at 1098).  "Put another way, substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"This is a highly deferential standard of review . . . ." *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009).  "The ALJ's findings will be upheld if supported by inferences reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citation omitted).  Additionally, "[t]he court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." *Id.*; *see, e.g.*, *Edlund*, 253 F.3d at 1156 ("If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner." (citations omitted)).

Nonetheless, "the Commissioner's decision 'cannot be affirmed simply by isolating a

specific quantum of supporting evidence.'" *Tackett*, 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)). "Rather, a court must 'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

Finally, courts "may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055–56 (9th Cir. 2006)). Harmless error "exists when it is clear from the record that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006)). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citations omitted).

## IV.    DISCUSSION

Plaintiff contends that the ALJ erred in three ways. First, Plaintiff claims the ALJ harmfully erred in failing to consider his "Borderline Intellectual Functioning" and "Antisocial Personality Disorder" severe at step two. (*See* Doc. 19 at 12–15; Doc. 26 at 1–5.) Second, Plaintiff asserts that the ALJ erred in her treatment of the opinion of Dr. Portnoff. (*See* Doc. 19 at 19–21; Doc. 26 at 5–8.) Finally, Plaintiff asserts that the ALJ improperly discounted Plaintiff's testimony regarding his subjective complaints. (*See* Doc. 19 at 22–26; Doc. 26 at 8–10.)

Defendant counters that that the ALJ did not commit harmful error in deeming Plaintiff's other mental impairments not severe; properly evaluated Dr. Portnoff's opinion; and properly relied on evidence in the record that undermined the credibility of Plaintiff's allegations of disabling symptoms and limitations. (*See* Doc. 22 at 7–15.)

### A.    The ALJ Did Not Commit Harmful Error at Step Two

#### 1.    Legal Standard

At step two of the sequential evaluation, the ALJ determines which of claimant's alleged impairments are "severe" within the meaning of 20 C.F.R. § 416.920(c). A severe impairment is one that "significantly limits" a claimant's "physical or mental ability to do basic work activities." *Id.* An ALJ must consider all the evidence at step two to determine whether a medically

1   determinable impairment significantly limits the claimant's ability to perform basic work activities.

2   *Id.* §§ 404.1520(a), 416.920(a); *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987).  "An impairment or

3   combination of impairments may be found 'not severe only if the evidence establishes a slight

4   abnormality that has no more than a minimal effect on an individual's ability to work.'"  *Webb v.*

5   *Barnhart*, 433 F.3d 683, 686–87 (9th Cir. 2005) (quoting Social Security Ruling ("SSR") 96–3p

6   (1996)).  The purpose of step two is to operate as "a de minimis screening device to dispose of

7   groundless claims."  *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996); *see also Hoopai v.*

8   *Astrue*, 499 F.3d 1071, 1076 (9th Cir. 2007) (the step two finding is "merely a threshold

9   determination" that "only raises a prima facie case of a disability."); *Buck v. Berryhill*, 869 F.3d

10  1040, 1048–49 (9th Cir. 2017) ("Step two is merely a threshold determination meant to screen out

11  weak claims.  It is not meant to identify the impairments that should be taken into account when

12  determining the RFC.") (internal citations omitted).  The plaintiff bears the burden of proof at step

13  two to show that an impairment qualifies as severe.  *Bowen*, 482 U.S. at 146 n.5.

14          **2.      Analysis**

15                  **a.      Antisocial Personality Disorder**

16          Plaintiff asserts there is "more than minimal" evidence documenting that he "suffers from

17  severe social anxiety and impaired judgment supporting a diagnosis of severe anti-social

18  personality disorder" and cites excerpts from the record that he contends support the diagnosis.

19  (*See* Doc. 19 at 14–15.)  His argument in this regard appears to conflate his *diagnosis* of antisocial

20  personality disorder with a severe impairment.  The mere diagnosis of a mental impairment is

21  insufficient to establish a severe impairment.  *See Febach v. Colvin*, 580 F. App'x 530, 531 (9th

22  Cir. 2014) ("[D]iagnosis alone is insufficient for finding a 'severe' impairment, as required by the

23  social security regulations."); *Holaday v. Colvin*, No. 2:14-cv-1870-KJN, 2016 WL 880971, at *12

24  (E.D. Cal. Mar. 8, 2016) ("The mere fact that plaintiff was diagnosed with such conditions is, by

25  itself, insufficient to demonstrate that they were 'severe' for step two purposes.").  Plaintiff's

26  diagnosis is not in dispute: following a psychological assessment, Dr. Swanson listed a finding of

27  antisocial personality disorder, per the Diagnostic and Statistical Manual of Mental Disorders

28

(DSM).[5]  (AR 336.)   However, Plaintiff has not demonstrated that his antisocial personality disorder limits—much less "significantly limit"—his ability to work.  The American Psychiatric Association defines antisocial personality disorder as "a pervasive pattern of, disregard for, and violation of, the rights of others," often including criminal behavior, impulsivity, irritability or aggressiveness, and irresponsibility.  *See* American Psychiatric Association, DSM-IV § 301.7 at 701–06 (2000).  Diagnosing physician Dr. Swanson opined that, notwithstanding his antisocial personality disorder, Plaintiff would be able to "relate appropriately to others in a job setting" and to "respond appropriately to usual work situations."  (AR 337.)  He further opined that Plaintiff would not have any difficulty with changes in routine or in maintaining social relationships.  (AR 337.)  The ALJ gave Dr. Swanson's opinion "some weight," (AR 24), a finding Plaintiff does not challenge.

Plaintiff points to mental status examinations results in the record that he contends show his "documented anxiety," "problems adjusting to life outside of history," "symptoms of avoidance of going out," and "impaired judgment" (Doc. 19 at 14–15), but does not explain the relationship between this evidence and limitations caused by antisocial personality disorder (as opposed to those caused by Plaintiff's PTSD or major depressive disorder, both of which the ALJ found severe at step two).   These excerpts also appear to have been "cherry picked" to support Plaintiff's conclusion, and do not account for the record as a whole.  For example, in April 2015, a mental status examination showed Plaintiff had acceptable judgment.  (AR 356.)  Dr. Swanson also found Plaintiff's judgment and insight intact during his psychological assessment in September 2015.  (AR 334.)  Plaintiff reported intermittent anxiety in September 2016, but indicated the symptoms were "manageable."  (AR 486.)  His mental status examination showed he maintained eye contact, had effective communication, and his judgment was within normal limits.  (AR 486.)

Plaintiff also attempts to rely on his subjective complaints to establish a "'more than

---

[5] The American Psychiatric Association defines antisocial personality disorder as "a pervasive pattern of, disregard for, and violation of, the rights of others," often including criminal behavior, impulsivity, irritability or aggressiveness, and irresponsibility.  *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders § 301.7, at 701–06 (4th ed. 2000).

1  minimal' degree of limitation in his . . . anti-social judgment."[6] (Doc. 19 at 15.)  As discussed more

2  fully below (*see* Section IV.B, *infra*), the ALJ properly discredited Plaintiff's subjective

3  complaints; but even if she had not, such complaints alone cannot establish severity. *See Ukolov*

4  *v. Barnhart*, 430 F.3d 1002, 1006 (9th Cir. 2005).

5          The Court therefore concludes that substantial evidence supports the ALJ's omission of

6  antisocial personality disorder as a severe impairment at step two, as Plaintiff has not met his

7  burden of demonstrating from the record that his antisocial personality disorder significantly limits

8  his ability to perform basic work activities.  *See Webb*, 433 F.3d at 686–87 (explaining that

9  impairments are non-severe if they have no more than a minimal effect on a claimant's ability to

10 work). *See also Bowen*, 482 U.S. at 146 n.5 (plaintiff bears the burden at step two).

11                     **b.      Borderline Intellectual Functioning**

12         In support of argument that the ALJ erred at step two by failing to include Plaintiff's

13 borderline intellectual functioning as a severe impairment, Plaintiff relies on the "cognitive

14 limitations" opined by consultative examiners Drs. Portnoff and Swanson.[7]  (*See* Doc. 19 at 12–

15 14; Doc. 26 at 2 n.2.)

16         The medical opinions of three types of medical sources are recognized in Social Security

17 cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not

18 treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant

19 (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  Ordinarily, more

20 weight is given to the opinion of a treating professional, who has a greater opportunity to know and

21 observe the patient as an individual. *Id.; Smolen*, 80 F.3d at 1285.  "To evaluate whether an ALJ

22 properly rejected a medical opinion, in addition to considering its source, the court considers

23 whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions."

24 *Cooper v. Astrue*, No. CIV S–08–1859 KJM, 2010 WL 1286729, at *2 (E.D. Cal. Mar. 29, 2010).

25 An ALJ may reject an uncontradicted opinion of an examining medical professional only for "clear

26

---

27 [6] It is not clear what to what "anti-social judgment" refers, or what relationship it bears to antisocial personality disorder.

28 [7] Plaintiff also relies on his subjective complaints to establish limitations in his cognitive functioning (*see* Doc. 19 at 15), but these complaints were properly discredited by the ALJ.  (*See* Section IV.B, *infra*.)

and convincing" reasons.  *Lester*, 81 F.3d at 830.   In contrast, a contradicted opinion of an examining professional may be rejected for "specific and legitimate reasons that are supported by substantial evidence."  *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (citing *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008)); *see also Lester*, 81 F.3d at 830.  "An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [her] interpretation thereof, and making findings.'"  *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)).  "The ALJ must do more than state conclusions.  [She] must set forth [her] own interpretations and explain why they, rather than the doctors', are correct." *Id.*  (citation omitted).

"[E]ven when contradicted, an examining physician's opinion is still owed deference and will often be 'entitled to the greatest weight . . . even if it does not meet the test for controlling weight.'"  *Garrison*, 759 F.3d at 1012 (quoting *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007)). The regulations require the ALJ to weigh the contradicted physician opinion, *Edlund*, 253 F.3d at 1157, except that the ALJ in any event need not give it any weight if it is conclusory and supported by minimal clinical findings.  *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (treating physician's conclusory, minimally supported opinion rejected); *see also Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).   The opinion of a non-examining professional, by itself, is insufficient to reject the opinion of an examining professional.  *Lester*, 81 F.3d at 831.

### i.       Dr. Portnoff

Neuropsychologist Dr. Portnoff performed a comprehensive psychiatric examination of Plaintiff in March 2016, including administering the WAIS-IV and WMS-IV tests.  (AR 395–403.) Plaintiff's "Full Scale" WAIS-IV score was 64, indicating a mild impairment, which Dr. Portnoff considered "a valid representation of his current cognitive status."  (AR 398.)  Plaintiff's WMS-IV score showed mild impairments in all areas except immediate memory, which was moderately impaired.  (AR 401.)  Dr. Portnoff diagnosed Plaintiff with "Unspecified Learning Disorder" and "R/O Attention Deficit-Hyperactivity Disorder Inattentive," and indicated that "[c]urrent cognitive testing is indicative of generalized deficiency in verbal and visual reasoning, working memory,

processing speed, and in immediate/delayed verbal/visual memory." (AR 402.)  From this, Dr.

Portnoff opined Plaintiff has mild to moderate limitations in his ability to complete a normal

workday or workweek without interruptions from a psychiatric condition due to combined

cognitive symptoms.  (AR 403.)

Although not specifically identified by the ALJ as a basis for its rejection, Dr. Portnoff's

opinion regarding Plaintiff's cognitive limitation is contradicted by the opinion of examining

physician Dr. Swanson.  Dr. Swanson found in September 2015 that Plaintiff's WAIS-IV score of

75 and WMS-IV scores of 69 and 76 were "low measure[s] of true functioning" due to poor effort,

and he opined that Plaintiff would be able to "maintain concentration and relate appropriately to

others in a job setting" and to "respond appropriately to usual work situations such as attendance,

safety, and the like." (AR 336, 337.)  Thus, the ALJ was required to state a "specific and legitimate

reason," supported by substantial evidence, for rejecting the opinion of Dr. Portnoff.  *Trevizo*, 871

F.3d at 675

In reviewing the medical evidence and giving "little weight" to the opinion, the ALJ stated

that it is inconsistent with prior testing results, as well as with the "longitudinal history of

[Plaintiff's] complaints and symptoms" and "mental status examinations in the record."  (AR 25.)

An ALJ may properly discount an examining physician's opinion that is not supported by the

medical record.  *See Batson v. Comm'r of Social Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004);

*Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) ("The ALJ need not accept the opinion of

any physician . . . if that opinion is brief, conclusory, and inadequately supported by clinical

findings."); *Khounesavatdy v. Astrue*, 549 F. Supp. 2d 1218, 1229 (E.D. Cal. 2008) ("[I]t is

established that it is appropriate for an ALJ to consider the absence of supporting findings, and the

inconsistency of conclusions with the physician's own findings, in rejecting a physician's

opinion.").

Here, the ALJ reasonably found Dr. Portnoff's opinion regarding Plaintiff's cognitive

limitation was not supported by the objective medical evidence and other evidence, particularly

Plaintiff's prior WAIS and WMS testing.  The record shows that Plaintiff's WAIS and WMS testing

scores in September 2015 were substantially higher than that in April 2016, and even these higher

scores were deemed by Dr. Swanson, also an examining psychologist, as "not an accurate measure of [Plaintiff's] functioning" due to "poor effort."[8]   (*Compare* AR 335–36 *with* AR 398–401.)  *See Morgan v. Comm'r of Soc. Sec. Admin*, 169 F.3d 595, 600–01 (9th Cir. 1999) (The ALJ may accord an opinion less weight based upon substantial evidence, including "clinical evidence" that the ALJ finds to be conflicting.).

Dr. Portnoff's opinion is also undermined by evidence of Plaintiff's reported symptoms and his mental status findings, both before and after Dr. Portnoff's assessment.  At the time of his diagnosis of PTSD in January 2015, Plaintiff's cognitive performance and abstraction were normal, with good insight, and he was found to be oriented to time, place, person, and situation.  (AR 349, 661.)  In April 2015, Plaintiff's mental status examination showed "[n]o overt psychopathology," his intellect was within normal limits and his insight and judgment were "acceptable."  (AR 356.)  Plaintiff's affect was full range.  (AR 356.)  A mental status examination performed in November 2015 showed Plaintiff was alert, oriented, and calm, with level affect and no overt psychosis.  (AR 365.)

Plaintiff denied any depressive feelings in December 2015, and, upon mental status examination, no psychosis was noted or reported, with Plaintiff appearing clean and neatly groomed with good hygiene.  (AR 366.)  He had good eye contact, with regular speech, a calm and cooperative demeanor, and appropriate affect.  (AR 366.)  In September 2016, a few months after Dr. Portnoff rendered his opinion, Plaintiff reported his symptoms of intermittent anxiety and depression were manageable  (AR 486.)  His mental status examination showed he was well-dressed with good hygiene, cooperation, eye contact, and effective communication  (AR 486.)  He was oriented on all spheres and speech was clear.  (AR 486.)  Plaintiff's mood was euthymic, and his thought process was linear and future oriented, with no bizarre delusions or paranoia.  (AR

---

[8] Plaintiff appears to contend that Dr. Portnoff's opinion deserves more weight than Dr. Swanson's solely because Dr. Portnoff is a specialist in neuropsychology.  (*See* Doc. 19 at 19–20.)  This argument is unavailing.  While the regulations *permit* an ALJ to give more weight to an opinion of a specialist in the relevant area, they do not *require* that an ALJ do so.  *See* 20 C.F.R. § 416.927(c)(5) ("We *generally* give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist") (emphasis added).  *See also Clark v. Colvin*, No. C13-791-JLR, 2013 WL 6189726, at *8 (W.D. Wash. Nov. 26, 2013) ("Section 404.1527 does not require the ALJ to give weight to a specialist.").  Indeed, an ALJ cannot reject a physician's opinion on the sole grounds that they are not a specialist.  *See, e.g., Perry v. Astrue*, No. 2:11–cv–3121–KJN, 2012 WL 6555074, at *4 (E.D. Cal. Dec. 14, 2012).

486.)  His insight and judgment were within normal limits.  (AR 486.)

During mental status examinations in November 2016, December 2016, and February 2017, Plaintiff's memory was determined to be intact.  (AR 442, 458, 469.)  Plaintiff reported in March 2017 that his mood was "more even."  (AR 434.)  Plaintiff's mental status examination showed his mood was pleasant but anxious, with good concentration.  (AR 434.)  His speech was clear, and his thoughts connected.  (AR 434.)  Plaintiff's behavior was withdrawn and restless, but his immediate, short and long-term memory were all intact.  (AR 434.)  Even Dr. Portnoff himself found Plaintiff demonstrated adequate concentration, persistence, and pace, his process of thought was coherent but mildly concrete, and his content of thought was appropriate to the situation.  (AR 396–97.)

In sum, the ALJ identified ample objective medical evidence and other evidence in the record that undermines Dr. Portnoff's opinion that Plaintiff is cognitively impaired such that he has mild to moderate limitations in his ability to complete a normal workday or workweek without interruptions.   This is a specific, legitimate reason supported by substantial evidence for discounting this opinion.[9]  *See Magallanes*, 881 F.2d at 751; *see also Batson*, 359 F.3d at 1195; *Thomas*, 278 F.3d at 957.   As the Court may neither reweigh the evidence nor substitute its judgment for that of the Commissioner, it will not disturb the ALJ's finding on this basis, even if, as Plaintiff points out (*see* Doc. 19 at 21), some of the above-described evidence could be construed more favorably to him.[10]   *See Robbins*, 466 F.3d at 882; *Thomas*, 278 F.3d at 954 (Where the

---

[9] The ALJ also rejected Dr. Portnoff's opinion in view of Plaintiff's "attempts at treatment" during the relevant time period.  (AR 25.)  Plaintiff's lack of compliance with his treatment, or failure to continue treatment altogether, is not a legitimate reason to reject Dr. Portnoff's opinion.  *See, e.g., Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996) ("[T]he fact that [a] claimant may be one of millions of people who did not seek treatment for a mental disorder until late in the day is not a substantial basis on which to conclude that [a physician's] assessment of [a] claimant's condition is inaccurate."); *see also Regennitter v. Comm'r Soc. Sec. Admin.*, 166 F.3d 1294, 1299–1300 (9th Cir. 1999) (noting that the Ninth Circuit has "particularly criticized the use of a lack of treatment to reject mental complaints both because mental illness is notoriously underreported and because 'it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation'") (quoting *Nguyen*, 100 F.3d at 1465).  Such error is harmless, however, in view of the ALJ's other permissible reason for discounting the opinion.  *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008).

[10] Plaintiff asserts that "[a]ssuming arguendo that the ALJ legitimately found 'ambiguity' in the record" regarding Plaintiff's WAIS and WMS scores, the ALJ "had a 'heightened' duty to further 'fully and fairly' develop the record."  (Doc. 19 at 22; Doc. 26 at 4.)  However, an ALJ's duty to develop the record further is triggered only when the record contains ambiguous evidence or is inadequate to allow for proper evaluation of the evidence.  *Mayes*, 276 F.3d at 459– 60 (citing *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001)).  Here, the test scores were not ***ambiguous***, they were ***conflicting***, and the ALJ reasonably weighed the evidence and resolved the conflict.  *See Lule v. Berryhill*, Case

1    evidence is susceptible to more than one rational interpretation, it is the Commissioner's conclusion

2    that must be upheld.); *Batson*, 359 F.3d at 1196 ("When evidence reasonably supports either

3    confirming or reversing the ALJ's decision, we may not substitute our judgment for that of the

4    ALJ.").

5                              ii.        **Dr. Swanson**

6           As noted above, consultative examiner Dr. Swanson diagnosed Plaintiff with borderline

7    intellectual functioning and limited him to work involving "simple instructions." (AR 336.)  This

8    was the only limitation opined by Dr. Swanson that was related to that diagnosis and the ALJ gave

9    "some weight" to that opinion as a whole (a finding Plaintiff does not challenge). (AR 24.)  Plaintiff

10   does not explain, much less establish, how this single impairment significantly limits his ability to

11   perform basic work activities.  *See Webb*, 433 F.3d at 686–87.

12          Even if the ALJ erred by failing to conclude, based on Dr. Swanson's opinion, that

13   Plaintiff's borderline intellectual functioning was severe, such error was at most harmless.  A

14   claimant is prejudiced at step two by an ALJ's omission of an impairment only where that step is

15   not resolved in the claimant's favor.  *See Burch*, 400 F.3d at 682 ("Here, the ALJ did not find that

16   Burch's obesity was a 'severe' impairment . . . . Assuming without deciding that this omission

17   constituted legal error, it could only have prejudiced Burch in step three (listing impairment

18   determination) or step five (RFC) because the other steps, including this one, were resolved in her

19   favor."); *see also Hickman v. Comm'r*, 399 F. App'x 300, 302 (9th Cir. 2010) ("Any error in the

20   ALJ's failure to include a reading disorder as one of Hickman's severe impairments at step two of

21   the analysis is harmless. The ALJ found Hickman suffered from other severe impairments and,

22   thus, step two was already resolved in Hickman's favor.").  Additionally, the failure to include an

23   impairment in the step two analysis is harmless if the ALJ considers the functional limitations that

24   flow from said impairment in subsequent steps.  *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir.

25   2007) (holding that ALJ's failure to list plaintiff's bursitis as a severe impairment at step two was

26   harmless where ALJ considered limitations caused by the condition at step four); *see also Molina*,

27

28   No.: 1:15-cv-01631-JLT, 2017 WL 541096, at *6 (E.D. Cal. Feb. 10, 2017) ("When there is conflicting medical
     evidence, 'it is the ALJ's role to determine credibility and to resolve the conflict.'").  Nothing more was required.

674 F.3d at 1115 (error is harmless "where it is inconsequential to the [ALJ's] ultimate nondisability determination").

Step two was resolved in Plaintiff's favor when the ALJ determined that his severe impairments included degenerative disc disease of the lumbar spine, mild degenerative changes of the cervical spine, patellofemoral chondromalacia of the knees, post-traumatic stress disorder (PTSD), and major depressive disorder; the ALJ then proceeded to the step three analysis. (AR 19–21.). It follows that, since Plaintiff's claims were not screened out at this step, he was not prejudiced by any error in the step two analysis. The ALJ went on to state in her RFC findings that she "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence . . . ." (AR 21; *see, e.g., Sara Ann W. v. Comm'r of Soc. Sec.*, No. 2:17-CV-00277-RHW, 2018 WL 4088771, at *4 (E.D. Wash. Aug. 27, 2018) ("[T]he ALJ specifically noted that she considered all symptoms in assessing the residual functional capacity. Accordingly, the Court finds the ALJ did not err in the step two analysis, and if any error did occur it was harmless.").)

More significantly, Plaintiff fails to identify any evidence, other than Dr. Portnoff's rejected opinion and Plaintiff's discredited complaints, demonstrating that his borderline intellectual functioning caused alleged limitations not accounted for in his RFC. The ALJ properly weighed the opinion evidence and Plaintiff's symptom claims and, as a result, the RFC incorporated the limitations supported by substantial evidence in the record, including a limitation to "simple routine tasks." (AR 21.)

Plaintiff asserts that the ALJ's error at step two is harmful because, pursuant to *Rounds v. Comm'r of Soc. Sec.*, 807 F.3d 996, 1003–04 (9th Cir. 2015), a limitation to simple routine tasks is inconsistent with the jobs the VE identified at step five that Plaintiff could perform, all of which require "Reasoning Level of Two" per the DOT. (*See* Doc. 19 at 17–18; Doc. 26 at 5.) However, a limitation to simple, routine tasks is not the same as one restricting a claimant to one-or two-part or-step instructions, the latter at issue in *Rounds*. *See id.* at 1003–1004 (distinguishing between the two). A limitation to simple, routine tasks is consistent with jobs requiring a reasoning level of two. *See Eyvonne G.W. v. Saul*, No. CV 19-4185-JPR, 2020 WL 4018589, at *4 (C.D. Cal. July

16, 2020); *Skelton v. Berryhill*, No. 6:16-cv-00115-AA, 2017 WL 1752955, at *7 (D. Or. May 2, 2017) ("This Court has repeatedly held that there is no inconsistency between reasoning level two and a limitation to simple, routine tasks.")   Thus, there is no inconsistency and therefore no prejudicial error at step two.

**B.      The ALJ Properly Found Plaintiff Less Than Fully Credible**

**1.      Legal Standard**

In evaluating the credibility of a claimant's testimony regarding their impairments, an ALJ must engage in a two-step analysis.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged.  *Id*. The claimant is not required to show that their impairment "could reasonably be expected to cause the severity of the symptom [he] has alleged; [he] need only show that it could reasonably have caused some degree of the symptom."  *Id*. (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)).  If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if they give "specific, clear and convincing reasons" for the rejection.  *Id*.  As the Ninth Circuit has explained:

> The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.  If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

*Tommasetti*, 533 F.3d at 1039 (citations and internal quotation marks omitted); *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226–27 (9th Cir. 2009).  Other factors the ALJ may consider include a claimant's work record and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains.  *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

The clear and convincing standard is "not an easy requirement to meet," as it is "'the most demanding required in Social Security cases.'"  *Garrison*, 759 F.3d at 1015 (quoting *Moore v.*

*Comm'r of Social Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).   General findings are not sufficient to satisfy this standard; the ALJ "'must identify what testimony is not credible and what evidence undermines the claimant's complaints.'"  *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (quoting *Lester*, 81 F.3d at 834)).

> ### 2.   Analysis

As mentioned above, the ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms."  (AR 22.)  The ALJ also found that "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."  (AR 22.)  Since the ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," the only remaining issue is whether the ALJ provided "specific, clear and convincing reasons" for Plaintiff's adverse credibility finding.  *See Vasquez*, 572 F.3d at 591.  Here, the ALJ found Plaintiff's credibility was undermined by the functional abilities he demonstrated in his activities that were inconsistent with his allegations of disability and the medical evidence of record, including "benign" examination findings with respect to his conditions.  (*See* AR 26.)

> #### a.   Inconsistency with Activity Level

The ALJ found that Plaintiff's "activities of daily living are not consistent with one who suffers such severe limitations as to preclude all work activity."  (AR 26.)  It is appropriate for an ALJ to consider a claimant's activities that undermine claims of severe limitations in making the credibility determination.  *See Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir. 1989); *Morgan*, 169 F.3d at 600; *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001)  *See also Thomas*, 278 F.3d at 958–59 (An ALJ may support a determination that the claimant was not entirely credible by identifying inconsistencies between the claimant's complaints and the claimant's activities.).  Notwithstanding, it is well-established that a claimant need not "vegetate in a dark room" in order to be deemed eligible for benefits.  *Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir. 1987).  However, if a claimant can spend a substantial part of their day engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may

be sufficient to discredit an allegation of disability.  *Fair*, 885 F.2d at 603.  "Even where [Plaintiff's] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." *Molina*, 674 F.3d at 1113.

Plaintiff alleges an inability to work due to post-traumatic stress disorder, which he alleges causes him to experience paranoia, get nervous in crowds or around law enforcement, hear voices, and have difficulty sleeping and nightmares.  (AR 22, 212, 248.)  According to Plaintiff, he does not spend time with others and cannot be with groups of people (AR 22, 217, 253.)  Plaintiff reported having trouble with memory, concentration, completing tasks, following instructions, and getting along with others due to his paranoia.  (AR 22, 217, 254.)  At the hearing, he testified he hears voices and sees shadows at least twice a week.  (AR 22, 55, 61, 62.)  According to Plaintiff, he does not sleep very well, he gets only a couple hours of sleep per night, and he experiences nightmares.  (AR 22, 62, 63.)  As a result of his lack of sleep, Plaintiff testified he has mood swings.  (AR 22, 64.)

However, in evaluating Plaintiff's credibility, the ALJ cited activities that were inconsistent with Plaintiff's testimony concerning the severity of his symptoms and impairments.  The ALJ noted, and the record reflects, that Plaintiff can complete household chores, including cooking, vacuuming, mopping, taking the trash out, laundry, and dishes as needed.  (AR 20, 405.)  He has no problems with personal care, such as personal hygiene and grooming.  (AR 21, 213, 214, 250.) The record shows that Plaintiff drives to medical appointments without accompaniment and can do some shopping in public stores.  (AR 20, 215, 216, 250, 252.)  The ALJ also noted Plaintiff's testimony that he designs and performs tattoos for others as a hobby.  (AR 20, 55–56.)  He reported having a "good relationship" with his six siblings and with his two 29-year-old sons.  (AR 20, 344, 656.)  According to Plaintiff, he watches television and performs "computer work" for about four hours per day.  (AR 405.)  The ALJ noted Plaintiff's statements in September 2016 that his alleged hallucinations "do no[t] limit his daily functioning" and that his anxiety and depression symptoms are "manageable," despite having stopped taking psychotropic medications.  (AR 23, 486.)

The Court finds Plaintiff's activities were reasonably considered by the ALJ to be

1   inconsistent with his alleged inability to work due to difficulties in memory, concentration,

2   completing tasks, following instructions, and getting along with others.  (AR 36.)  Even if some of

3   these activities do not rise to the level of transferable work skills, as Plaintiff suggests, *see* Doc. 19

4   at 26, they are, as a whole, inconsistent with allegations of completely debilitating impairment.

5   *Molina*, 674 F.3d at 1113.  Accordingly, the inconsistencies between Plaintiff's activity level and

6   his complaints was a clear and convincing reason to find his statements and testimony not credible.

7   *See* 20 C.F.R. § 416.929(c)(3); *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008).

8               **b.    Inconsistency with Objective Medical Evidence**

9           The ALJ's additional ground for discounting Plaintiff's credibility is that his allegations

10  of significant limitations are inconsistent with the objective medical evidence, specifically his

11  normal mental examination findings.[11]  (AR 35–36.)  An ALJ may not reject a claimant's

12  subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged

13  severity of [the impairment]."  *Burch*, 400 F.3d at 680.  Nonetheless, "lack of medical evidence .

14  . . is a factor that the ALJ can consider in his credibility analysis."  *Burch*, 400 F.3d at 681.  *See*

15  *also Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir.2004); *Morgan*, 169 F.3d at 600.  Stated

16  differently, "[a]lthough the inconsistency of objective findings with subjective claims may not be

17  the sole reason for rejecting subjective complaints of pain, it is one factor which may be

18  considered with others."  *Salas v. Colvin*, No. 1:13–cv–00429–BAM, 2014 WL 4186555, at *6

19  (E.D. Cal. Aug. 21, 2014) (citations omitted).

20          Here, Plaintiff contended he hears voices and sees shadows, and has trouble with memory,

21  concentration, completing tasks, following instructions, and getting along with others.  (AR 61, 62

22  217, 254.)  However, as the ALJ observed (AR 22–23), even at the time of Plaintiff's diagnosis of

23  PTSD in January 2015, his mental status examination showed he was cooperative with good eye

24  _____

[11] In discrediting Plaintiff's subjective complaints, the ALJ also states that some of Plaintiff's alleged impairments

25  "have been responsive to treatment and do not impose a disabling degree of limitation."  (AR 26.)  To the extent the
    ALJ intended this reference to pertain to Plaintiff's alleged mental, as opposed to physical impairments, such assertion

26  is belied by the record.  Plaintiff was prescribed multiple psychotropic medications to treat his depression, auditory
    hallucinations, and symptoms of PTSD, but the record shows his symptoms were made worse by treatment and that he

27  also suffered severe side effects as a result.  (*See, e.g.*, AR 61, 62, 219, 256, 358, 360, 361, 363, 365, 366, 384.)  While
    this is not a clear and convincing reason to reject Plaintiff's subjective statements regarding his mental impairments, it

28  nevertheless harmless error in view of the other, permissible reasons articulated by the ALJ for discounting Plaintiff's
    credibility.  *See Carmickle*, 533 F.3d at 1162 (citing *Batson*, 359 F.3d at 1197); *Tonapetyan*, 242 F.3d at 1148.

contact; was oriented to time, place, person, and situation; with normal motor activity, normal cognitive performance, normal abstraction, and good insight.  (AR 349, 661.)  Plaintiff had clear speech, full affect, and "unremarkable" mood.  (AR 349–50, 661–62.).  A few months later, in April 2015, treating physician Dr. Benton examined Plaintiff and noted he was pleasant, cooperative, neat, and well-groomed, with good hygiene.  (AR 356.)  His intellect was within normal limits; his insight and judgment "acceptable"; and he had a full affect.  (AR 356.)  During the examination, Dr. Benton noted Plaintiff exhibited no overt psychosis (AR 356) and he repeated this finding during examinations performed in May (AR 358), July (AR 360), September (AR 361), October (AR 363), November (AR 365), and December 2015 (AR 366).  Plaintiff's mental status examinations by Dr. Benton in May, November, and December 2015 also showed that he was alert and oriented, neat and calm, and in no overt distress.  (AR 358, 365, 366.)  In May 2015, Dr. Castellino noted Plaintiff's pleasant affect and that he was "not worried or depressed," but he indicated "some" anxiety.  (AR 384.)

In September 2015, Plaintiff underwent a mental evaluation by Dr. Swanson, where Plaintiff was found to be adequately oriented to person, time, place, and situation.   (AR 334.)  Plaintiff's attitude during the assessment was friendly and cooperative, with normal eye contact. (AR 334.)  Dr. Swanson noted Plaintiff's speech was unremarkable with no observed peculiarities. (AR 334.)  He was found to exhibit a full range of affect that varied consonantly with speech content, with a euthymic mood.  (AR 334.)  Dr. Swanson noted Plaintiff's form and content of thought were within normal limits, with no evidence of delusional material or disorder of perception. (AR 334.)  Plaintiff's short-term, recent, and remote memories were all within normal limits, and he was found to have adequate abstraction ability and concentration for performing simple mathematical calculations.  (AR 334.)  Plaintiff's judgment and insight were deemed intact and his general fund of knowledge fell within normal limits.  (AR 334.)  Dr. Swanson found Plaintiff maintained satisfactory attention and concentration and the results of the assessment were considered a "valid representation of current functioning."  (AR 334.)

A year later, a mental status examination showed Plaintiff was cooperative, maintained eye contact, and had effective communication  (AR 486.)  He was oriented on all spheres and his speech

1   was clear.  (AR 486.)  Plaintiff's mood was euthymic with affect that was congruent to mood; his

2   thought process was linear and future oriented, with no bizarre delusions or paranoia; and his

3   insight and judgment were within normal limits.  (AR 486.)  An examination in December 2016

4   showed Plaintiff had connected and relevant thoughts, and his immediate, short and long-term

5   memory were all intact.  (AR 458.)   As the ALJ noted (AR 23), these normal findings occurred

6   again in February (AR 442 (Plaintiff's speech was clear and connected, his thoughts connected and

7   relevant, and immediate, short-, and long-term memory were all intact)) and March 2017 (AR 434

8   (Plaintiff's mood was pleasant but anxious, with good concentration; his speech was clear; his

9   thoughts connected; and immediate, short and long-term memory were all intact)).

10        The Court finds that the ALJ's conclusion that the evidentiary record, showing a history of

11   essentially normal examinations, is inconsistent with Plaintiff's subjective statements and

12   testimony is supported by substantial evidence.  While Plaintiff may disagree with the ALJ's

13   interpretation of the medical evidence (*see, e.g.,* Doc. 19 at 24–25), it is not within the province of

14   this Court to second-guess the ALJ's reasonable interpretation of that evidence, even if such

15   evidence could give rise to inferences more favorable to Plaintiff.[12]  *See Rollins*, 261 F.3d at 857

16   (citing *Fair*, 885 F.2d at 604).  The ALJ's determination that Plaintiff's complaints are inconsistent

17   with the objective medical evidence is therefore an additional clear and convincing reason for

18   discounting his subjective symptom testimony.  *See Molina*, 674 F.3d at 1113 (concluding that the

19   ALJ properly discredited claimant testimony based on inconsistencies with objective medical

20   evidence).  *See also* 20 C.F.R. § 416.929(c)(3).

21                     **V.     CONCLUSION AND ORDER**

22        After consideration of Plaintiff's and the Commissioner's briefs and a thorough review of

23   the record, the Court finds that the ALJ's decision is supported by substantial evidence and is

24   therefore AFFIRMED.  The Clerk of this Court is DIRECTED to enter judgment in favor of

25   Defendant Andrew Saul, Commissioner of Social Security, and against Plaintiff.

26

27   IT IS SO ORDERED.

28   [12] Plaintiff points to the opinion of Dr. Portnoff as evidence supporting his complaints.  (*See* Doc. 19 at 24.)  However, as the Court previously found, *see* Section IV.A.2.b.i *supra*, this opinion was properly discredited by the ALJ.

1

2

Dated:   **September 18, 2020**                      /s/ *Sheila K. Oberto*

UNITED STATES MAGISTRATE JUDGE

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28